|  |  |
|---|---|
| PANGNHIA VUE, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PENTAGON FEDERAL CREDIT UNION, and DOES 1 through 100, inclusive,<br><br>Defendants. | No. 1:21-cv-01063-JLT-SAB<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS<br><br>(Doc. 11) |

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

## I. INTRODUCTION

Ms. Vue's claims arise out of a contract dispute over how many times her credit union, PFCU, may charge a fee when there are insufficient funds in her account to cover a pre-authorized payment. (Doc. 1 at 2.) She contends that the contract allowed only for one fee, no matter how many times the merchant attempted to collect the amount owed. PFCU contends that the contract allowed for the fee each time the merchant attempted to collect the fee. For the reasons set forth below, PFCU's motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**.

///

///

1

## II.     BACKGROUND

The Automated Clearing House (ACH) is "a nationwide network through which depository institutions send each other batches of electronic credit and debit transfers."[1] The National Automated Clearing House Association (NACHA) governs the development and administration of the ACH network in the United States. (*See* Doc. 1 at 14; Doc. 11-2 at 5.) Under NACHA's rules, when a payment is returned for insufficient funds, the originating merchant may attempt to process that payment two more times. (Doc. 11-1 at p. 10.)

When PFCU receives an ACH request and the client does not have sufficient funds to cover the incurred amount, PFCU can decide to pay the amount due and overdraw the client's account, or it can decide not to pay. (Doc. 1 at 6.) These decisions result in either a fee for overdraft or insufficient funds (NSF). When PFCU decides not to pay, the originating merchant may attempt the transaction two more times. (Doc. 11-1 p. at 10; Doc. 14 at 18.)

PFCU charges its clients an NSF fee of $30 when the client's account does not have the funds to cover their ACH payment whether that transaction is the originating merchant's first, second, or third attempt to collect the funds. (Doc. 1 at 2.) This means that a client can be charged as many as three NSF fees related to the same outstanding balance. (*Id.*)

Plaintiff contends that this practice is predatory and that PFCU should charge only one fee regardless of how many times the merchant attempts to process the payment. (Doc. 1 at 2.) Plaintiff argues that even when a transaction is attempted multiple times, it is still the same "item." (Doc. 1 at 5.) Specifically, Plaintiff disputes the insufficient funds fees she incurred on May 6, 2021, May 7, 2021, May 12, 2021, and May 13, 2021, when her account did not have the funds to cover two ACH payments.[2] (Doc. 1 at 4.) Plaintiff is unsure whether this same fact pattern occurred at other times. (*Id.*)

On these facts, Vue asserts several claims against Pentagon Federal Credit Union on

---

[1] Because the Court could not easily locate background information about the ACH system in the record, it has taken judicial notice of the basic nature of ACH. *See* Board of Governors of the Federal Reserve System, Automated Clearinghouse Payments, available at: https://www.federalreserve.gov/paymentsystems/fedach_about.htm (last visited August 9, 2023); Fed. R. Evid 201 (allowing judicial notice of facts that are not subject to reasonable dispute).

[2] The May 12, 2021 transaction corresponds to the initial May 6, 2021 transaction; the May 13, 2021 transaction corresponds to the initial May 7, 2021 transaction.

2

behalf of herself and a putative class: 1) breach of contract, 2) breach of the covenant of good faith and fair dealing, 3) unjust enrichment, 4) money had and received, 5) violation of California's unfair competition law (UCL), Cal. Bus. & Prof. Code § 17200 *et seq.*, and 6) violation of California Consumer Legal Remedies Act (CLRA), Cal. Civ. Code §§ 1750 *et seq.*

### III.     LEGAL STANDARDS

#### A.     Motion to Dismiss

The purpose of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is to test the legal sufficiency of the complaint. *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). A dismissal may be warranted where there is "the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court accepts as true the allegations in the complaint and construes the allegations in the light most favorable to the plaintiff. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Love v. United States*, 915 F.2d 1242, 1245 (9th Cir. 1989). However, the court will not assume the truth of legal conclusions cast in the form of factual allegations. *United States ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643 n.2 (9th Cir. 1986). While Federal Rule of Civil Procedure 8(a) does not require detailed factual allegations, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive dismissal under Rule 12(b)(6). *Iqbal*, 556 U.S. at 676. A complaint must do more than allege mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555.

Claims that are "grounded in fraud" are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure, which requires a plaintiff to state, "with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b*); Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009). Thus, under Rule 9, "[m]ere conclusory allegations of

fraud are insufficient." *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir. 1989). A plaintiff's factual allegations must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985). To satisfy the heightened pleading standard, a party must "identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." *Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1019 (9th Cir. 2020) (quoting *Davidson v. Kimberly-Clark*, 889 F.3d 956, 964 (9th Cir. 2018)).

### B. Choice of Law

"Federal courts sitting in diversity must apply 'the forum state's choice of law rules to determine the controlling substantive law.'" *Fields v. Legacy Health Sys.*, 413 F.3d 943, 950 (9th Cir. 2005). This Court will therefore apply California's choice of law rules. California follows the Restatement (Second) of Conflict of Laws § 187(2) to determine which state's laws are applicable under a choice of law clause. *Nedlloyd Lines B.V. v. Superior Ct.*, 3 Cal. 4th 459 (1992). California has a "strong public policy favoring enforcement of [choice-of-law] provisions." *Id*. A valid choice of law provision should be enforced "unless 1) the chosen state has no substantial relationship to the parties or transactions; or 2) such application would run contrary to a California public policy or evade a California statute." *Gen. Signal Corp. v. MCI Telecommunications Corp.*, 66 F.3d 1500, 1506 (9th Cir. 1995).

The first step is to "to determine either: (1) whether the chosen state has a substantial relationship to the parties or their transaction, or (2) whether there is any other reasonable basis for the parties' choice of law." *Nedlloyd*, 3 Cal. 4th at 465. If neither test is met, then courts should not enforce the choice-of-law provision. "If, however, either test is met, the court must next determine whether the chosen state's law is contrary to a *fundamental* policy of California." *Id*. (emphasis in original.) If no conflict exists, then the court should enforce the choice-of-law provision. However, where a fundamental conflict with California law exists, "the court must then determine whether California has a "materially greater interest than the chosen state in the

4

1  determination of the particular issue." *Id*. (internal quotations omitted.) If California has a greater
2  interest, the choice-of-law provision should not be enforced.[3]

3  Though the above tests determine the *validity* of a choice-of-law provision, courts must
4  also analyze the *scope* of the provisions and whether they were intended to apply to all claims.
5  *See Cont'l Airlines, Inc. v. Mundo Travel Corp.*, 412 F. Supp. 2d 1059, 1065 (E.D. Cal. 2006)
6  (first analyzing the validity of the choice-of-law provision and analyzing the scope of the
7  agreement only once the court determined it was valid.) California courts have read the phrase
8  "governed by" broadly as a reflection of two sophisticated parties' intent for the contract to be
9  "completely and absolutely controlled by the law of the chosen jurisdiction." *Id*. (internal
10 quotations omitted.) When "governed by" appears in the text of a choice of law provision, as is
11 the case here, California courts have found that it applies to all claims "arising from or related to"
12 the contract. *Id.*

### IV.   ANALYSIS

14 Neither party disputes the existence of a contract, but they dispute the meaning and
15 implication of terms in that contract. PFCU contends that Plaintiff fails to state a claim because
16 the terms of the contract are clear and allow it to charge the fees that Plaintiff is challenging.
17 (Doc. 11-1 at 2.) Plaintiff argues that the contract does not permit PFCU to charges these fees and
18 that had she understood the terms to be what PFCU claims they are, she never would have signed
19 the contract and would have chosen to bank elsewhere. (Doc. 1 at 12.)

   **A.  Choice of Law**

21 The operative membership contract and disclosures contain choice-of-law provisions[4]
22 whereby the parties agree to adjudicate any claims related to ACH transactions under Virginia

---

[3] The Court notes that case law is inconsistent and that some courts do not apply the greater interest test. *See Continental Airlines, Inc.*, 412 F.Supp.2d 1059 (ending the choice-of-law analysis at the fundamental policy stage); *see also Gustafson v. BAC Home Loans Servicing, LP*, 294 F.R.D. 529, 537 (C.D. Cal. 2013) (ending the choice of law analysis at the substantial relationship stage despite finding that there was a substantial relationship).

[4] The choice-of-law provisions read:

**"Choice of law disclosure for wire transfers and ACH transactions.** PenFed may accept on my behalf payments to my account which have been transmitted through one or more Automated Clearing Houses or by wire transfer and which are not subject to the Electronic Fund Transfer Act. My rights and obligations with respect to such payments shall be construed in accordance with and governed by the laws of the Commonwealth of Virginia as provided by the

5

1  law. Plaintiff does not dispute the choice of law provisions and concedes they govern unless there
2  is a conflict with California's fundamental public policy or California has a materially greater
3  interest in the determination of an issue than the state chosen by the parties in the choice-of-law
4  clause. (Doc. 14 at 26.) Even still, Plaintiff does not challenge that Virginia law applies to the first
5  four claims (breach of contract, breach of the covenant of good faith and fair dealing, unjust
6  enrichment, and money had and received). She challenges only whether Virginia law applies to
7  the fifth and sixth claims. (Doc. 14 at 26.)

8        PFCU argues that the scope of these clauses precludes Plaintiff from advancing her
9  statutory claims. (Doc. 11-1 at pp. 3, 13.) PFCU contends that Plaintiff cannot maintain any
10 California statutory claims because the choice of law provision provides that federal and Virginia
11 law will govern disputes between the parties. (*Id*. at 3:8-12.)

12       The first step in resolving this dispute is to determine whether a party or the transaction
13 has a substantial relationship to the chosen state or if there is any other reasonable basis for the
14 parties' choice of law. *Wash. Mut. Bank, FA v. Superior Ct.*, 24 Cal. 4th 906, 916 (2001). PFCU
15 is registered in and has its principal place of business in Virginia. (Doc. 11-1 at p. 8.) No party
16 disputes that this constitutes a substantial relationship to Virginia or that this is a reasonable basis
17 for choosing Virginia law. (*See* Doc. 14 at 25.)

18       The Court must next determine whether there are any potential conflicts with the choice of
19 law provision and the forum's fundamental policies. Plaintiff asserts that applying Virginia law as
20 to the UCL and CLRA claims would be contrary to California's fundamental public policy

---

22 operating rules of the NACHA, which are applicable to ACH transactions involving my account, and/or by Regulation J for wire transfers." (Doc. 11-1 at 4.)

24 "I understand that this account shall be governed by the Code of Virginia, federal laws, National Credit Union Administration (NCUA) Rules and Regulations and the bylaws and policies and procedures of the Credit Union and any amendments thereto. This account shall be subject to other terms and conditions which are subject to change upon notice to me." (*Id*. at 7.)

26 "This account shall be governed by the Code of Virginia, Federal Laws, Rules and Regulations and the Bylaws of PenFed and any amendments thereto." (*Id*. at 7.)

28 "This account shall be governed by the laws of the Commonwealth of Virginia and the Uniform Commercial Code." (*Id*. at 8.)

6

1  because California's public policy is to "prevent the exploitation of consumers through deception

2  and fraud." (Doc. 14 at 26.) Plaintiff cites *America Online, Inc. v. Superior Ct.*, 90 Cal. App. 4th

3  1, 5 (2001), as modified (July 10, 2001), to argue that California provides greater substantive

4  protections for consumers than Virginia law. (*Id.*) Indeed, in *America Online*, the California court

5  found there is a conflict between California consumer protection policies and Virginia law.[6]

6        The final step of the choice of law analysis to is determine whether California has a

7  materially greater interest in the determination of the issues than Virginia does. *Nedlloyd*, 3 Cal.

8  4th at 466. In *Ruiz v. Affinity Logistics Corp.*, 667 F.3d 1318, 1324 (9th Cir. 2012), The Ninth

9  Circuit held that, "[t]o determine whether California has a materially greater interest than [the

10 chosen law], we must analyze the following factors: (1) the place of contracting; (2) the place of

11 negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of

12 the contract; and, (5) the domicile, residence, nationality, place of incorporation, and place of

13 business of the parties." Of these factors, only the fifth does not weigh exclusively in favor of

14 California's interest. The fifth factor, at most, is mixed because, though PFCU is incorporated in

15 Virginia, the plaintiff is a California resident and domiciled here and PFCU has a place of

16 business in this state.

17       PFCU does not address whether Virginia or California has a materially greater interest in

18 the resolution of this matter. Plaintiff argues that California has a materially greater interest

19 because Virginia law provides consumers with significantly less protections. (Doc. 14 at 26.)

20 However, in doing so, Plaintiff ignores that she seeks to certify a nationwide class and provides

21 no information as to how many of the prospective class members are California consumers, who

22 would be entitled to the protections of the CLRA and how many are not California consumers,

23 who would not be entitled to these protections. Instead, without analysis or citation to authorities,

24 the complaint proceeds as if *all* consumers are entitled to the protections of the CLRA. On the

25 other hand, the number of putative class members outside of California is information that

26 uniquely within the possession of the defense. Thus, because the Court is obligated to protect the

---

[6] Numerous other courts have also found that "California has a fundamental policy to protect remedies under the CLRA." *Sawyer v. Bill Me Later, Inc.*, No. CV 10-04461 SJO (JCGz), 2010 WL 11492736, at *3 (C.D. Cal. Dec. 14, 2010).

7

interests of the class, the Court declines now to decide the choice of law related to the prospective class.

As to Plaintiff's individual claims, the Court is persuaded that California has a materially greater interest in the resolution of the matter. *See Vrugtman v. It's Just Lunch Int'l LLC*, 2021 WL 4979443, at *7 (C.D. Cal. Sept. 24, 2021) (finding that California has a materially greater interest than Nevada in protecting its own consumers); to *Lloyd v. Navy Fed. Credit Union*, 2018 WL 1757609, at *6 (S.D. Cal. Apr. 12, 2018 [same].

Plaintiff contends that a "[s]imilar analysis applies to choice-of-law clauses involving California UCL claims" (Doc. 14 at 27), and that the Court should not enforce the choice of law provisions because it "would be contrary to the fundamental policy of California to prevent the exploitation of consumers through deception and fraud." (Doc. 14 at 26.) PFCU does not dispute that both statutes are similar. Both the UCL and CLRA are meant to protect consumers by allowing them to bring class actions and expand the available remedies, and they have similar public policy considerations. *See Am. Online, Inc.,* 90 Cal. App. 4th at 5. The Court in *Sawyer v. Bill Me Later, Inc.*, No. CV 10-04461 SJO (JCGx), 2010 WL 11492736 (C.D. Cal. Dec. 14, 2010), found that enforcing a choice-of-law provision where Utah was the chosen state "would contradict a fundamental California policy" because the UCL allows for plaintiffs to seek monetary relief for violations of the statute itself. As with the CLRA, various other courts have found that the UCL's intended purpose is a fundamental California policy. *See Vrugtman*, 2021 WL 4979443, at *9) (finding that "[t]he UCL, through its purpose and provisions, evidences a fundamental policy of remedying injuries to the consumer").

Based upon the rationale set forth above, the motion to dismiss as to Plaintiff's individual claims is **DENIED** and it is **DENIED without PREJUDICE** as to the class claims brought under these the California statutes.

### B.     Count I: Breach of Contract

To state a claim for breach of contract under Virginia law, plaintiffs must allege: 1) that the defendant had a legally enforceable obligation to the plaintiff, 2) the defendant's violation or breach of that obligation, and 3) injury or damage to plaintiff caused by defendant's violation or

8

1  breach. *Navar, Inc. v. Fed. Bus. Council*, 291 Va. 338, 344 (2016).

2  Plaintiff alleges that "Defendant mischaracterized in the Account Documents its true NSF
3  Fee practices and breached the express terms of the Account Documents." (Doc. 1 at 17.) Plaintiff
4  also alleges that "[n]o contract provision authorizes Defendant to charge more than one NSF Fee
5  on the same item." (*Id*.) Finally, Plaintiff alleges that she sustained money damages because of
6  the breach. (*Id*. at 18.) Specifically, Vue asserts that appropriate NSF fees were assessed against
7  her on May 6, 2021 and May 7, 2021 after Plaintiff attempted an ACH payment without sufficient
8  funds to cover that payment, but on, May 12, 2021, and May 13, 2021, without Plaintiff
9  requesting reprocessing of those "items," PFCU processed them again, returned the items unpaid
10 again, and improperly charged Plaintiff another fee on each of those occasions. (*Id*. at 4.)

11 PFCU asserts that "[a]ll of Vue's claims fail because the contract at issue authorized
12 PenFed to charge the challenged fees." (Doc. 11-1 at pp. 2-3.) PFCU argues that (1) the contract
13 clearly states that PFCU charges an insufficient funds fee for "each pre-authorized withdrawal
14 that is not paid" (*id*. at 9); and (2) that the contract's references to an "item" or "debit item," when
15 read in context, indicate that PCFU's non-sufficient funds policies allow it to treat multiple
16 attempts to process a charge as separate "items" for purposes of imposing fees (*id*. at 11-12).

17 The pertinent terms of the deposit agreement between Plaintiff and PFCU provide as
18 follows:

19 > A fee will be assessed for non-sufficient funds or uncollected funds (deposits on
20 > hold); refer to the Service Fees available at PenFed.org for the amount of this fee.
> This fee applies to withdrawals by means of a check, ACH debit, or an electronic
21 > debit. This fee will be assessed should we decline to pay the item or pay the item,
> creating a negative balance on my account. PenFed in its sole discretion will decide
22 > whether to pay an item thus creating a negative balance on my account. My account
> may be subject to other fees and charges. Service Fees are available online at
23 > PenFed.org or by telephone at 800-247-5626.

24 > . . .

25 > At PenFed's sole discretion, each check or debit item will either be paid, thereby
> bringing my account to a negative status, or the item will be returned unpaid. My
26 > account will be subject to the normal non-sufficient funds and returned-item charges
> then in effect.

27 (Doc. 1 at 5.)

28

> PREAUTHORIZED TRANSFERS. Your account will be charged a fee for each pre-authorized withdrawal which is not paid because of nonsufficient funds or a fee for each pre-authorized withdrawal not paid because of uncollected funds.

(*Id.*)

PFCU argues that "PREAUTHORIZED TRANSFERS" language permits it to charge an NSF fee "each" time Vue's merchants attempted to collect a pre-authorized payment and her account lacked sufficient funds. (Doc. 11-1 at 12.) But Plaintiff contends that this language is ambiguous because:

> that provision never says what PFCU now claims it does. Specifically, the provision never says PFCU will assess a "fee 'each' time [Plaintiff's] merchants attempted to collect a preauthorized payment." That is an invention of counsel. What the provision actually says is "a fee for each pre-authorized withdrawal which is not paid." Again, the promise is for a fee for an "preauthorized transfer," not a fee each time a "preauthorized transfer" is declined or paid. That term—like all those other terms PFCU used in its contract, discussed supra—is reasonably understood to refer to the accountholder's single order or instruction for payment from her account.

(Doc. 14 at 22.) PFCU notes that the cases cited by Plaintiff discuss interpretation of the term "item." (Doc. 16 at 10.) Even still, the question remains whether the language is amenable to Plaintiff's interpretation. The Court cannot find it is not. At least on the present record, the Court concludes that the term "pre-authorized withdrawal" could be interpreted as the accountholder's single order or each time a merchant seeks payment.

PFCU makes a related argument that Vue authorized re-presentment of the withdrawal requests because the choice of law provisions indicate that the contract is to be governed not only by Virginia law, but also by the NACHA rules. (Doc. 16 at 4.) NACHA's rules permit merchants to submit up to two additional payment requests after an initial request is returned for insufficient funds and that a receiving financial institution accept a represented request, therefore obligating PFCU to process re-presented payments. (Doc. 11-1 at p. 10 (citing NACHA rules).) Plaintiff cannot reasonably dispute that a merchant can attempt collection of the authorized amount up to two times after the initial collection effort failed for insufficient funds.

The question, then, is whether the rules are sufficiently clear to demonstrate that despite that an ACH transaction can occur up to three times, that the fee for insufficient funds can be imposed up to three times also. Though the Court finds this interpretation to be highly

10

reasonable—it cannot say, at least at this stage of the litigation, that the PREAUTHORIZED TRANSFERS paragraph is amenable *only* to the reasonable interpretation PFCU offers.[7]

The Court next turns to the contract's various references to the term "item." Plaintiff alleges that PFCU violated the contract it has with its clients to charge a single insufficient funds fee for each "item," thereby collecting additional fees that it was not entitled to under the terms of the contract. (Doc. 1 at 3.) Plaintiff contends that a separate attempt to collect a payment should be considered the same "item" as the original. (*Id.* at 5.) In opposing dismissal, Plaintiff argues that the contract's language related to the term "item" is at the very least ambiguous. (Doc. 14 at 11.)

> Plaintiff asserts that an "ACH," "check," or "item" is the same "ACH," "check" or "item" even when it is reprocessed a second or third time after an initial return for insufficient funds, because those terms reasonably refer to an accountholder's order or instruction for payment (no matter how many times that order or instruction is re-processed by a bank or merchant). To take the simplest example: when an accountholder writes a check to a certain merchant, for a certain amount, bearing a certain check number, that "check" does not reasonably become a new "check" when the merchant reprocesses it two or three times. Because Plaintiff has pled a reasonable meaning of the disputed terms to support his claims, dismissal of Plaintiff's claims is inappropriate.

(Doc. 14 at 8.) In support of this argument, Plaintiff indicates that in the 18 months preceding the filing of its opposition, at least 16 federal courts have denied motions to dismiss in similar circumstances. (*See id*. at pp. 11-12 (summarizing cases).)

PFCU disagrees with this interpretation,[8] pointing to the following language, taken from its membership disclosures:

> If on any day the available funds in my account are not sufficient to cover the checks and other debit items posted to my account, those checks and items will be handled in accordance with PenFed's normal non-sufficient funds policies and procedures. At PenFed's sole discretion, each check or debit item will either be paid, thereby bringing my account to a negative status, or the item will be returned unpaid. My account will be subject to the normal non-sufficient funds and returned-item charges then in effect.

---

[7] That being said, the implication that, in essence, Plaintiff' can thwart or withdraw her authorization for payment merely by maintaining an insufficient amount of money in her account, tests credulity.

[8] PFCU initially doubles down on its reliance on the PREAUTHORIZED TRANSFERS paragraph discussed above, indicating that "the provision which specifically addresses preauthorized transfers does not use the word 'item'" at all. (Doc. 11-1 at p. 11.) Of course, this is correct. However, the Court is uncertain how this bears on the analysis in light of the Deposit Agreement which *does* use this term (Doc, 11-2 at 5) and the fact that the PREAUTHORIZED TRANSFERS section refers to "each item of preauthorized transfer" rather than each time a preauthorized transfer is attempted.

11

(Doc. 11-1 at p. 11.)

PFCU asserts that the foregoing language is dispositive because it makes it "crystal clear" that PenFed determines whether an account has sufficient funds to cover an "item" based on "the balance of, and activity in, her account on the specific day that the 'item' has posted." (Doc. 11-1 at p. 11-12.) As a result, according to PFCU, it does not make sense to interpret the word "item" to refer collectively to separate requests that occurred six days apart. (*Id*. at 12.) To a certain extent, this begs the question of whether an "item" refers only to the aspect of a transaction initiated by the consumer on one occasion, or whether it also encompasses each attempt by the merchant to accomplish the debit.

PFCU cites to *Lambert v. Navy Fed. Credit Union,* No. 1L19-CV-103-LO-MSN, 2019 WL 3843064 (E.D. Va. Aug. 14, 2019), for the proposition that the language in its membership disclosure sufficiently informed Plaintiff that a fee would be charged for each attempt. In *Lambert*, plaintiff sued her credit union over its practice of charging "multiple nonsufficient funds fees for multiple attempts to process a single payment request in violation of contractual language implying only a single nonsufficient fund fee would ever be charged for a payment request." *Id*. at *1. The plaintiff in *Lambert* alleged that this practice violated the banking contract between her and Navy Federal Credit Union. *See id*.

That contract provided that "[a] fee may be assessed . . . for each returned debit item." *Id*. at *3. Both parties in *Lambert* agreed that an "item" was a request for payment, but disagreed on whether two debit requests made by the same merchant for the same amount and purpose were part of the same "item." The plaintiff in *Lambert* made the same argument that the Plaintiff here makes: that multiple ACH requests were akin to writing multiple checks. 2019 WL 3843064 at *3; (Doc. 14 at 15). The *Lambert* court found this unpersuasive, reasoning that a check that has yet to clear is not the same as one that is rejected or bounces and that an automatic ACH transaction is closer to the latter than it is the former. *Lambert*, 2019 WL 3843064 at *4. Navy Federal Credit Union's contract specifies that "a fee will be assessed … for each refused check." *Id*. Therefore, if a check bounces and a merchant then presents a second check and that too bounces, the credit union would be able to charge a second fee under the terms of the contract. *Id*.

1  This, combined with the contract language, which reads "Navy Federal may return debits to the
2  checking account (e.g., an ACH payment) if the amount of the debit exceeds funds available in
3  the checking account" and "[a] fee may be assessed in the amount shown on Navy Federal's
4  current Schedule of Fees and Charges for each returned debit item," permitted Navy Federal to
5  charge multiple NSF fees. *Id*. Ultimately, the *Lambert* court disagreed with plaintiff's argument
6  that the word "item" created ambiguity and concluded instead that the terms of the contract, taken
7  as a whole, rendered the contract unambiguous. *Id*.

8  The facts in *Lambert* are analogous to our facts here, but the language used in each
9  contract is not identical. Moreover, other courts have reached different conclusions in similar
10 circumstances. For example, in *Veronica Gardner, Plaintiff, v. Flagstar Bank, FSB, Defendant.*,
11 No. 20-CV-12061, 2021 WL 3772866 (E.D. Mich. Aug. 23, 2021), the plaintiff also alleged that
12 defendant charged multiple NSF fees whenever electronic transactions or checks were returned
13 unpaid. *Id*. Like in *Lambert*, the dispute in *Gardner* centered around the use of the term "item."
14 *Id*. Plaintiff argued that "the same item on an account cannot conceivably become a new one each
15 time it is rejected for payment then reprocessed, especially when [] [p]laintiff Gardner took no
16 action to resubmit them." *Id* (internal punctuation omitted.) PFCU, as in *Lambert* and in the
17 instant case, argued that an 'item' is not defined as a single presentment of a transaction and that
18 the contract permitted charging multiple NSF fees. *Id*.

19 The *Gardner* court noted that "numerous federal courts around the country have
20 overwhelmingly permitted claims premised on ambiguous uses of the term 'item' to proceed in
21 cases against financial institutions" and found that "Plaintiff's construction of the Agreement is
22 also reasonable, and 'the definition of 'item' is ambiguous with regard to whether a resubmission
23 of an ACH transaction is a separate item or is a part of thew same initial ACH transaction, and
24 that ambiguity must be read in favor of Plaintiff [] at this stage.'" *Gardner*, 2021 WL 3772866 at
25 *7 (citing *Perks v. TD Bank*, 444 F. Supp. 3d 635 (S.D.N.Y. 2020).) The *Gardner* court found
26 that the language of the contract[9] before it "cannot be said to have the same clarity as the *Lambert*

---

[9] The contractual language in *Gardner* is as follows:

13

contract" and that the "case lends itself to two reasonable interpretations of 'item.'" *Id*. at 8. Moreover, the *Gardner* court noted that "when other courts have found similar contractual language to be both unambiguous and ambiguous, such case law is of limited guidance on a motion to dismiss." *Gardner*, 2021 WL 3772866 at *2.

The Court, having considered the language of the contract in the instant case, *Lambert*, and *Gardner* finds that Plaintiff's interpretation of the contract in the instant case is not unreasonable. The language here is not as specific as the language in *Lambert*. As discussed above, the contract in *Lambert* provided that a "fee may be assessed… for each returned debit item." Based on this language, it was sufficiently clear in *Lamber* that a fee will be charged any time that the credit union returns a debit. The language here is less clear. Rather than simply

---

**Items are intended to refer to any debits against your account** and include, but are not limited to, withdrawal tickets, checks, transfers, electronic debits, imaged debits, wire transfers, ATM debits, ACH debits, bill pay debits, photo copy debits, bank generated debits, and debit card point of sale transactions[.]
*Gardner*, 2021 WL 3772866 at *6 (emphasis in original).

Posted transactions are Items and/or deposits reflected in your Balance.
*Id*.

Pending transactions are Items (for example, electronic debits, ACH debits, bill pay debits, bank generated debits), electronic/ACH deposits, and debit card authorizations/holds that have been received by the bank but not yet posted to your Balance.
*Id*.

We may determine whether your Available Balance is sufficient to pay an Item at any point between (1) **the time an Item is presented to us** or we receive notice regarding the Item and (2) the time the Item is returned.
*Id*. at 7 (emphasis in original).

We may refuse to pay an overdraft item at any time even though we may have previously paid overdrafts for you. For example, we typically do not pay overdraft items if your account is not in good standing as defined above, or, if based upon our review of your account management, we determine that you are using Bounce Protection excessively. **You will be charged an NSF fee for each item returned.**
*Id*.

And:
Overdrafts above and beyond your established Bounce Protection Limit may result in checks or other items being returned to the payee**. The Non-Sufficient Fee (NSF) will be charged per item and assessed to your account.** An OD/NSF notice will be sent to notify you of items paid and/or returned. If the account is overdrawn, it may be subject to the current Consecutive Days Overdrawn (OD) fee.
*Id.* (emphasis in original).

14

explaining that the NSF fee can be charged each time the merchant attempts payment, the contract refers to the "item," "pre-authorized withdrawal," "Returned ACH," and "Preauthorized Debit," without ever clarifying how the bear on the imposition of fees. The *Gardner* court pointed out that the contract in *Lambert* "contained more express contractual language placing a customer on notice that multiple fees may be assessed on the same underlying transaction." *Gardner*, 2021 WL 3772866 at *8. The same is true here. The contract does not specify that PFCU can charge multiple NSF fees when a merchant presents a previously unpaid transaction again. A consumer could read this language as a single ACH transaction, regardless of how many times it is attempted. PFCU's membership disclosures do not define an item or a preauthorized withdrawal as something that may be presented multiple times, thereby incurring multiple fees. Consequently, PFCU's motion to dismiss the breach of contract claim is **DENIED.**

**C.     Count II: Breach of the Covenant of Good Faith and Fair Dealing**

PFCU requests dismissal of Plaintiff's claim for breach of the covenant of good faith and fair dealing and contends that it is not a stand-alone cause of action in Virginia and is therefore subsumed by Plaintiff's breach of contract claim. (*Id*. at 12:18-23.) PFCU is correct that breach of covenant of good faith and fair dealing is generally not a stand-alone cause of action under Virginia law, but that is not always the case. PFCU relies on *Peregrine Dev. Int'l, Inc. v. Pac. Architects & Engineers Inc.*, No. 1:09CV700, 2009: WL 10693622 (E.D. Va. Sept. 22, 2009), but in that case, the court found that "every contract contains an implied covenant of good faith and fair dealing; however, a breach of those duties only gives rise to a breach of contract claim, not a separate cause of action" *unless* "there has been an assertion of facts beyond those that constitute a breach of contract (e.g. bad faith or dishonesty)." *Id.* at *1. To plead a breach of the covenant, a plaintiff needs to allege more than "unfavorable exercise of [PFCU's] explicit contractual rights" and needs to allege that PFCU's actions were "actually dishonest." *Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 450 (E.D. Va. 2009).

Plaintiff alleges that PFCU intentionally hid its true fee practice from its clients as a way of maximizing its fee revenue. (Doc. 1 at 10, 12.) Plaintiff further states that she would not have chosen to bank with PFCU had she known what its true fee practices were. (*Id*. at 12.) Plaintiff

1  asserts that other banks that charge multiple insufficient funds fees are forthcoming with its
2  customers about these fees, but that PFCU was not to allow it to charge fees to unsuspecting
3  clients, thereby increasing its revenue. (*Id*. at 6-10.) Plaintiff alleges that the industry standard
4  across is to be transparent regarding the fee schedule, something that Plaintiff alleges PFCU did
5  not do. (*Id*.) Thus, Plaintiff does not allege that PFCU breached the covenant of good faith and
6  fair dealing in fulfilling the contractual duties.

7  Instead, Plaintiff alleges that PFCU engaged in bad faith negotiations when forming the
8  contract by hiding its true fee practice. Though "Virginia law on this subject is not robust… it is
9  consistent with the Restatement" and is clear that the covenant of good faith and fair dealing
10 "does not deal with good faith in the formation of a contract." *Montalla, LLC v. Commonwealth*,
11 No. 0127-22-2, 2023 WL 3061976, at *8 (Va. Ct. App. Apr. 25, 2023), *appeal granted* (Sept. 15,
12 2023). This claim cannot survive because the covenant of good faith and fair dealing does not
13 apply to the *formation* of contracts and Plaintiff's allegations as to this claim are all based on the
14 *formation* of the contract, rather than the exercise. Therefore, PFCU's motion to dismiss count II
15 for breach of the covenant of good faith and fair dealing is **GRANTED** with leave to amend.

16  **D.   Counts III: Unjust Enrichment**

17  Plaintiff pleads unjust enrichment as an alternative to counts I and II of the complaint.
18 (Doc. 1 at ¶ 93.) PFCU moved to dismiss this claim on the grounds that unjust enrichment cannot
19 exist where there is an express contract, as there is here. (Doc. 11-1 at p. 13.) Plaintiff asserts
20 there is nothing preventing these claims from being pled as alternatives to each other. (Doc. 14 at
21 27:28 – 28:7.) Plaintiff cites to In re Bay Vista of Virginia, Inc., 2009 WL 2900040 (E.D. Va.
22 June 2, 2009), for this proposition (Doc. 14 at 27-28). However, *McLeskey* reaffirms that
23 "plaintiff cannot recover for unjust enrichment if an enforceable contract exists." *Id.* at *6.
24 *McLeskey* allowed the unjust enrichment claim to proceed as an alternative claim *only* because
25 the parties disagreed whether there was an enforceable contract. *Id*. Because the parties agreed
26 there was an enforceable contract as to one of the claims, the court dismissed the unjust
27 enrichment claim related to that contract, but maintained the unjust enrichment claims as to the
28 three disputed contracts. *Id.* Because there is no dispute in this case over the existence of an

enforceable contract, the unjust enrichment claim is **DISMISSED**.

### E.   Count IV: Money Had and Received

PFCU contends that Plaintiff's claim for money had and received should be dismissed because it is duplicative of Plaintiff's claim for unjust enrichment. (Doc. 11-1 at p. 13.) To support this PFCU cites to *Liebau v. Seven Oaks Limited Partnership*, No. 118066, 1991 WL 834960, at *1 (Va. Cir. Ct. May 9, 1991), which describes money had and received as the "modern version of the common law action of assumpsit for money had and received." (*Id*.) Plaintiff correctly points out that PFCU does not cite any authority that stands for claims for money had and received being subject to *dismissal* when asserted together with a claim for unjust enrichment. (Doc. 14 at 28.) Nonetheless, like the unjust enrichment claim, the money had and received claim is indisputably quasi-contractual, and as *McLeskey* indicates, such claims cannot be maintained where the existence of a contract is undisputed. PFCU's motion to dismiss count IV for money had and received is **GRANTED**.

### F.   Counts V and VI: Plaintiff's California Statutory Claims

Plaintiff brings two statutory claims under California law: one for breach of the UCL and one for breach of the CLRA. The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. "Its coverage has been described as 'sweeping,' and its standard for wrongful business conduct is 'intentionally broad.'" *Elias v. Hewlett–Packard Co.*, 903 F. Supp. 2d 843, 854 (N.D. Cal. 2012). The CLRA seeks to "protect consumers against unfair and deceptive business practices." Cal. Civ. Code § 1760.

Specifically, Plaintiff alleges that PFCU violated the UCL by committing "fraudulent business acts and practices" by "charging multiple NSF fees on a single item, or an NSF Fee followed by an Overdraft Fee, thereby charging fees that were not contracted in either the Account Agreement or Fee Schedule." (Doc. 1 at 20.) Plaintiff further alleges that she "justifiably relied on PFCU's deceptive representations they would be assessed fees only as provided in the Class Period Fee Schedule and Account Agreement." (*Id*. at ¶ 108.)

PFCU argues for dismissal of both these claims on the ground that the claims do not meet the heightened pleading standard required by Rule 9 (Doc. 11-1 at p. 14) and dismissal of the

1  Plaintiff's UCL claim because breach of contract claim cannot provide the basis for a UCL claim
2  (*id.*) and "a UCL claim based on the allegation that overdraft fees were 'unfair' [are] pre-empted
3  by federal law." (*Id.* at 14-15.)

4  As a threshold matter, PFCU is correct (*see* Doc. 11-1 at 14) that allegations of breach of
5  contract cannot, on their own, provide a basis for a UCL claim. *See Dillon v. NBCUniversal*
6  *Media LLC*, No. CV 12-09728 SJO AJWX, 2013 WL 3581938, at *8 (C.D. Cal. June 18, 2013)
7  (collecting cases). Plaintiff does not appear to refute this, instead pivoting to insist that she has
8  alleged that PCFU has misrepresented its fee practices. (Doc. 14 at 29 (citing Doc. 1 at 10-12).)
9  The portions of the complaint cited by Plaintiff point out that other banks clearly disclose the
10 potential that multiple presentments of debits can lead to the imposition of multiple fees (*see* Doc.
11 1 at 6-10), but PFCU does not make such a disclosure and "and in so doing, breaches its contracts
12 with accountholders, engages in bad faith conduct, and deceives its accountholders." (*Id.* at 10.)
13 Relatedly, Plaintiff alleges that PFCU "specifically advertises its Access America checking
14 accounts as an 'account that earns you more,'" (id. at 12), while at the same time fails to
15 "disclose[] that it uses secret, fee-maximizing policies designed to strip its members of their hard-
16 earned funds. PCU fails to inform consumers that, unlike other banks (like Chase), it will assess
17 multiple insufficient funds fees on the same item, each and every time it is re-processed." (*Id.*) In
18 the Court's view, this is an attempt to allege misrepresentation by omission. The problem is, as
19 discussed below, that this claim is preempted.

20     1.   Preemption

21 The Supremacy Clause gives the federal government the authority to preempt state law.
22 *Beaver v. Tarsadia Hotels*, 816 F.3d 1170, 1178 (9th Cir. 2016). Federal preemption of state law
23 may occur expressly, by implication, or by actual conflict with federal law. Express preemption
24 occurs when Congress states in explicit terms its intent to preempt state law. *Jones v. Rath*
25 *Packing Co.*, 430 U.S. 519, 525(1977). Preemption by implication, or "field preemption," occurs
26 when federal regulation in a particular area is "so pervasive as to make reasonable the inference
27 that Congress left no room for the States to supplement it." *Rice v. Santa Fe Elevator Corp.*, 331
28 U.S. 218, 230(1947). Finally, conflict preemption exists when there is an actual conflict between

state and federal law. *See Fidelity Federal Savings & Loan Assoc. v. de la Cuesta,* 458 U.S. 141, 153 (1982).

Express preemption is at issue here. The regulations implementing the Federal Credit Union Act ("FCUA") states that:

> A Federal credit union may, consistent with this section, parts 707 and 740 of this subchapter, other federal law, *and its contractual obligations*, determine the types of fees or charges and other matters affecting the opening, maintaining and closing of a share, share draft or share certificate account. *State laws regulating such activities are not applicable to federal credit unions.*

*Lambert*, 2019 WL 3843064, at *2 (quoting 12 C.F.R. § 701.35(c)) (emphasis in original). "[I]t is well established that state law claims regarding a federal credit union's failure to disclose certain fee practices or any perceived unfairness in the fee practices themselves are preempted." *Id*. However, "it is equally well established that true breach of contract and affirmative misrepresentation claims are not federally preempted." *Id*.

Plaintiff concedes that claims arising out of "unfairness" are preempted but argues that her claims are brought under the "fraudulent" prong of the UCL and are therefore not preempted. (Doc. 14 at 28-29.) The Court disagrees. No matter which prong Plaintiff purports to bring her claim, it is still a "state law claim[] regarding a federal credit union's failure to disclose certain fee practices," and therefore, it is preempted. Plaintiff's claim is premised on a theory of misrepresentation by omission; she alleges that PFCU did not affirmatively represent (i.e., disclosed) its fee practices. As the *Lambert* court discussed, this is an area that is clearly preempted by the FCUA. Thus, Plaintiff's allegations of misrepresentation by omission are preempted and cannot be maintained. Thus, the motion on this basis is **GRANTED without leave to amend**.

   2. Heightened Pleading Standard

To the extent that Plaintiff purports to bring her claims based on a theory of fraudulent misrepresentation, PFCU is correct that these claims are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. (Doc. 11-1 at p. 14.) As discussed above, this means that a plaintiff's factual allegations must be specific enough to put

19

defendant on notice as to the misconduct alleged. Plaintiffs can satisfy this standard by "identify[ing] the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." *Supra Moore*, 966 F.3d at 1019.

As best as the court can ferret out, Plaintiff alleges that PFCU represents itself as a low fee credit union when it in fact, is not. (Doc. 1 at 11 ("In marketing and promotions, PCU describes itself as a consumer-friendly, low-fee credit union.").) This allegation is not pled with sufficient particularity to meet the 9(b) standard. There is no allegation that an additional NSF fee is mutually exclusive with being "low fee." At most, the claim that PFCU purports to be low fee appears to be non-actionable puffery on PFCU's part. *See Sumer v. Carrier Corp.*, No. 14-CV-04271-VC, 2015 WL 758314, at *2 (N.D. Cal. Feb. 20, 2015) (finding that "general statements about the reliability and quality [of a product] are non-actionable puffery.") Mere puffery cannot, as a matter of law, "deceive a reasonable consumer." *Id*. For the foregoing reasons, PFCU's motion to dismiss Plaintiff's claim under the CLRA is **GRANTED with leave to amend**.

### V. CONCLUSION

Accordingly, for the reasons discussed above, Pentagon Federal Credit Union's motion to dismiss (Doc. 11) is **GRANTED IN PART and DENIED IN PART as set forth above.**

IT IS SO ORDERED.

Dated:   **September 29, 2023**

UNITED STATES DISTRICT JUDGE